■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v CRAIG WILLIAMS, Also Known as GUTTER, Appellant. [856 NYS2d 743]—

Kavanagh, J. Appeal from a judgment of the County Court of Schenectady County (Giardiano, J.), rendered April 17, 2007, convicting defendant following a nonjury trial of the crimes of perjury in the first degree (six counts) and perjury in the third degree.

On the evening of September 30, 2003, Unishon Mollette was mortally wounded by a gunshot as she sat in the rear seat of an

automobile owned by defendant. The automobile was later found by the police in an abandoned lot in the City of Schenectady, Schenectady County and subsequently traced to defendant. In May 2004, after executing a waiver of immunity, defendant testified under oath before a grand jury investigating the circumstances surrounding Mollette's death. Because of his apparent attempt to conceal the vehicle after the homicide, defendant was charged by indictment with tampering with physical evidence, but was ultimately acquitted of that charge. Two years later, in May 2006, another grand jury charged defendant by indictment with 13 counts of perjury in the first degree in regard to the sworn testimony that he gave before the grand jury as to his knowledge of the circumstances surrounding the shooting and his actions upon fleeing the scene.

After a nonjury trial, defendant was convicted of six counts of perjury in the first degree and one count of perjury in the third degree. He was subsequently sentenced as a second felony offender to 3½ to 7 years in prison for each of the six counts of perjury in the first degree[1] and for time served on his conviction for perjury in the third degree. Defendant appeals and argues that the convictions for perjury in the first degree as set forth in counts 6, 7, 10 and 11 of the indictment are not supported by legally sufficient evidence and the consecutive sentences as imposed were improper.

Defendant contends that the testimony claimed to be false as set forth in counts 6, 7, 10 and 11 of the indictment were not material to the charge that the grand jury ultimately filed against him—tampering with physical evidence—and therefore cannot support his conviction on each count for perjury in the first degree. He specifically contends that since this sworn testimony did not specifically relate to the allegation that he attempted to improperly dispose of physical evidence involved in a crime, it was not relevant or material to the focus of the grand jury's inquiry and, thus, even if it was false, it could not serve as a basis for his conviction of perjury in the first degree. Defendant further claims that if materiality is lacking, any conviction for perjury in the first degree must be reduced to perjury in the third degree and the sentence imposed for each perjury in the third degree conviction must be time served.

A person is guilty of perjury in the first degree "when he [or she] swears falsely and when his [or her] false statement (a) consists of testimony, and (b) is material to the action, proceed-

---

1. The sentences for counts 11, 12 and 13 run concurrently to each other. The sentences for counts 6, 7 and 10 run consecutively to each other and concurrently with the terms for counts 11, 12 and 13.

ing or matter in which it is made" (Penal Law § 210.15). False testimony is considered material if it " 'has the natural effect or tendency to impede, influence or dissuade the grand jury from pursuing its investigation' " (*People v Davis*, 53 NY2d 164, 171 [1981], quoting *United States v Stone*, 429 F2d 138, 140 [2nd Cir 1970]). Moreover, whether the testimony, as given, is material is a question to be decided by the trier of fact (*see People v Stanard*, 42 NY2d 74, 80 [1977], *cert denied* 434 US 986 [1977]).

Initially, it must be noted that the grand jury that took testimony from defendant was investigating not only defendant's activities on the night of Mollette's death, but also the circumstances of her being mortally wounded as she sat in the back seat of his automobile. The fact that it ultimately decided to charge defendant with attempting to conceal certain physical evidence that was relevant to the grand jury's investigation of that homicide did not serve to define the permissible parameters of that investigation or limit the grand jury's power to charge other offenses committed in connection with that homicide (*see* CPL 190.65 [2]; *People v Lancaster*, 69 NY2d 20, 25 [1986], *cert denied* 480 US 922 [1987]). The questioning of defendant during that proceeding focused on the grand jury's efforts to develop evidence that would identify the person or persons responsible for Mollette's death and any questions that sought to address that issue were clearly relevant and material to that inquiry (*see People v Davis*, 53 NY2d at 170-171; *People v Stanard*, 42 NY2d at 80; *see also Wood v People*, 59 NY 117, 123 [1874]).

We also note that defendant, in the presence of counsel, executed a waiver of immunity agreeing to waive his right against self-incrimination during his appearance before the grand jury as well as "any possible or prospective immunity to which he would otherwise become entitled" (CPL 190.45 [1]). The record does not reflect the existence of any limitations being placed on that waiver of immunity (*see* CPL 190.45 [4]), and defendant was specifically instructed at the outset of his appearance before the grand jury that it was investigating charges which arose "out of an incident that occurred on September 30, 2003 in the City of Schenectady." Moreover, at trial, the Chief Assistant District Attorney who presented defendant's case to the grand jury testified that "the real gravamen of the [g]rand [j]ury proceeding was to try to get to the heart of the Mollette homicide." He further stated that had defendant testified truthfully, it would have allowed the grand jury to broaden the scope of its inquiry into the Mollette homicide and identify those responsible for her death.

Defendant testified that he was sitting with Mollette in his automobile parked on Stanley Street in Schenectady when he heard a number of gunshots. He immediately drove from the scene and only when he was about a block away did he realize that Mollette, who had been in the back seat, was wounded. As he exited his vehicle to check on her condition, two individuals he knew from school, but could not identify, came upon them, apparently running from the scene of the shooting; they got into his car and the three men then drove Mollette to a hospital. Because he feared that the individuals who were in his car might steal it, defendant testified that he left the hospital without identifying either himself or Mollette.[2] He also testified that after the car became disabled, he left it parked on a city street and went home.

Other evidence presented at trial paints a very different picture of the nature of defendant's activities that evening and strongly supports the conclusion embodied by the verdict that defendant knew not only who it was who perpetrated the shooting, but also the identities of other individuals who had witnessed it. Specifically, testimony from other witnesses at trial established that the victim was with defendant in his automobile on Stanley Street when defendant met with an individual named William Farrow.[3] As Farrow and defendant stood outside defendant's car, Farrow saw Kenneth Portee approach them on foot, holding a handgun aimed at defendant. When Portee began firing the rounds from the weapon, both defendant and Farrow fled on foot. As they were about a block away from the shooting, defendant and Farrow were met by a third person, subsequently identified as Shamah Ellis, who had entered defendant's automobile and was now driving. When Farrow entered the back seat of the vehicle, he saw that the victim had been shot, was bleeding and was having difficulty breathing. The three men drove to the hospital where they left the victim without disclosing her identity or their own to hospital personnel. They later abandoned the vehicle in a vacant lot in Schenectady.

This evidence provided the basis for the claim that defendant had perjured himself when he testified before the grand jury "that he did not see the person who fired the gunshots . . . and who shot at defendant and his Honda and fatally wounded . . .

---

**2.** The only item found in Mollette's possession by the medical authorities at the hospital was a cell phone which police were able to use to ultimately identify her.

**3.** In the presentence report, defendant stated, "The whole purpose of this case was me going to buy drugs."

Mollette" (count 7), "about the identities of the two male friends who rode to the hospital . . . with defendant and the mortally-wounded . . . Mollette" (count 10), "denied seeing anyone he knew . . . at the time of the shooting, denied arranging for his male friend to meet him there, denied talking with this friend . . . denied seeing this friend at all until after defendant had left the block [and] denied knowing this friend's name" (count 6) and "about his reason for leaving [the hospital] immediately after dropping off the mortally-wounded . . . Mollette and before the police could arrive . . . [t]hat he left in such haste solely because one or more of his passengers demanded it and threatened to steal his car" (count 11). Given the content of this testimony and the relevance it bore to the grand jury's investigation into the circumstances surrounding the death of Mollette, we find that it was, in all respects, material to that inquiry and provided a legally sufficient basis for defendant's convictions for the crime of perjury in the first degree under these counts (see People v Taylor, 44 AD3d 1159, 1162 [2007], lv denied 9 NY3d 1039 [2008]).

Next, defendant argues that the consecutive sentences imposed by County Court were improper, harsh, excessive and an abuse of discretion. We disagree. Initially, defendant contends that concurrent, as opposed to consecutive, sentences must be imposed when the sentence is "for two or more offenses committed through a single act or omission, or through an act or omission which in itself constituted one of the offenses" (Penal Law § 70.25 [2]). However, consecutive sentences may be imposed if the acts involved, though part of a continuous course of conduct, can be separated into separate and "distinct events" (Matter of Di Lorenzo v Murtagh, 36 NY2d 306, 310 [1975]; see People v Brown, 66 AD2d 223, 226 [1979]). Applying this standard to testimony given by a witness during an appearance before a grand jury, if the testimony involves a distinct and "discrete subject[ ]" matter, it may constitute separate and distinct acts of perjury for which consecutive sentences may be imposed (Matter of Di Lorenzo v Murtagh, 36 NY2d at 312). Here, while defendant's testimony focused on a single event—the death of Mollette—the perjury convictions which resulted in the imposition of consecutive sentences involved three discrete and distinct aspects of that event and defendant's participation in it. The questions posed to him, which the grand jury found to be perjurious, concerned the whereabouts and identification of an eyewitness to the shooting (count 6), defendant's knowledge of the identity of the perpetrator of the shooting (count 7) and the identity of those individuals who were with defendant when the victim was transported to the hospital (count 10). Accord-

ingly, the consecutive sentences imposed on these counts were not violative of Penal Law § 70.25 (2).

Finally, we disagree that the prison terms imposed—an aggregate term of $10^{1/2}$ to 21 years—was, under all of the circumstances, harsh, excessive, or an abuse of discretion. Defendant's failure to testify truthfully as to what he knew at the time of the shooting and, in particular, his refusal to identify the individual responsible, not only impeded the investigation and subsequent prosecution, but also had an agonizing effect on the victim's family.[4] His callous disregard for the victim's well-being as she lay wounded in the back seat of his car[5] and his obvious reluctance to get her medical help, coupled with the fact that he has a prior criminal record that includes a felony conviction, provides ample justification for the sentence that was imposed.

Cardona, P.J., Mercure, Spain and Lahtinen, JJ., concur. Ordered that the judgment is affirmed.

---

4. On December 11, 2006, Portee was sentenced to a prison sentence of 50 years to life for his conviction for manslaughter in the second degree and other crimes he committed in connection with the death of Mollette.

5. Evidence presented at trial alleged that defendant, when told that the victim would be taken to the hospital so she could receive medical care, stated "[k]ick the bitch out of the car."