■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v BRENDA J. SNYDER, Appellant. [937 NYS2d 429]—

Garry, J.

A person is guilty of depraved indifference murder when, "[u]nder circumstances evincing a depraved indifference to human life, he [or she] recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes the death of another person" (Penal Law § 125.25 [2]). Defendant's convictions of assault in the first degree required proof that, "[u]nder circumstances evincing a depraved indifference to human life, [she] recklessly engage[d] in conduct which create[d] a grave risk of death to another person, and thereby cause[d] serious physical injury to another person" (Penal Law § 120.10 [3]). Likewise, to support defendant's conviction of reckless endangerment in the first degree, the People were required to prove that "under circumstances evincing a depraved indifference to human life, [she] recklessly engage[d] in conduct which create[d] a grave risk of death to another person" (Penal Law § 120.25).

Although defendant advances a variety of challenges to her convictions, her primary challenge on appeal relates to the legal sufficiency and weight of the evidence.[2] She argues that the evidence does not support a finding that she committed any of the acts alleged, that she possessed the necessary mens rea or that she caused injury to either of her children. We reject these contentions.

The People's case was based entirely on the theory that defendant attempted to cause breathing problems in both of her children by suffocating them for the purpose of collecting government benefits. To that end, the People presented extensive testimony from the numerous pediatricians, specialists, nurses, emergency personnel and social workers who cared for the children or otherwise interacted with defendant and her

---

2. Defendant's challenge to the constitutionality of the depraved indifference statute as impermissibly vague is unpreserved because she failed to raise such challenge before County Court (see People v Riddick, 34 AD3d 923, 925 [2006], lv denied 9 NY3d 868 [2007]). In any event, this argument lacks merit (see People v Suarez, 6 NY3d 202, 213-214 [2005]; People v Riddick, 34 AD3d at 925).

children from the birth of defendant's son in 1992 until the death of defendant's daughter in 1996. The mostly circumstantial evidence established that both children were admitted to the hospital—after experiencing difficulty breathing and being rushed to the emergency room—on numerous occasions following their births for what appeared to be apnea episodes. Each episode occurred during daytime hours, defendant was the only person present when the symptoms began and she was the sole source of information as to what occurred. Although numerous tests were performed, the results were routinely normal and medical personnel were unable to determine any organic cause for the children's identical breathing problems. One such test performed on defendant's daughter revealed that her apnea originated in the lung area, rather than in the brain, indicating that it was caused by something blocking her airway. According to various medical witnesses, there were other indicators that the children's problems were caused by suffocation, including reports of blood in their noses or mouths and certain recorded information on heart and respiratory rate monitors, which signified that their lungs were healthy but that the oxygen flow had been interrupted for a period of time.

Medical personnel who came in contact with defendant and her children at the hospital observed more than one incident that caused them to suspect that defendant was suffocating them. After one such incident, Donald Swartz, the pediatric pulmonologist for defendant's son, directed that defendant not be left alone with the child while he was in the hospital, and he experienced no further apnea episodes during the remainder of his hospital stay. Swartz thereafter discharged the son with orders that he not be left alone at home with defendant and made arrangements for nurses to regularly visit the home. When the son was later readmitted to the hospital, defendant and the child's father[3] requested that Swartz not be involved in caring for him.

Subsequently, defendant's daughter was referred to Daniel Shannon, a pediatrician at Massachusetts General Hospital, who diagnosed her with a sinus node dysfunction with a possible seizure disorder and recommended surgery to implant a pacemaker.[4] Despite such surgery, the daughter's apnea episodes continued and she was admitted to the emergency room several times thereafter with reported seizures. No seizures were ever

---

3. This person was also referred to as defendant's boyfriend or husband.

4. This recommendation was in direct conflict with the opinion of Thomas Truman, the director of the pediatric intensive care unit of Massachusetts

documented during her hospital stays and none were actually witnessed by medical personnel.

Ultimately, in January 1996, defendant's daughter was rushed to the local hospital emergency room in respiratory and cardiac arrest. She was transferred to another hospital, where she died a few days later. Her death was determined to have resulted from a lack of oxygen and inadequate blood flow to the brain. The chief medical examiner who performed the autopsy on defendant's daughter testified that he was unable to rule out suffocation as the cause of death, and that he believed that the manner of death was "consistent with a homicide." The People's expert witness similarly testified that, in her opinion, both children's frequent hospitalizations resulted from suffocation, which carried a significant risk of death, and that the death of defendant's daughter was, in fact, caused by suffocation.

Pamela Marshall, an inmate at the Franklin County Jail when defendant was incarcerated there after her arrest, also testified for the People. According to Marshall, defendant spoke with her about the case on one occasion and told Marshall that she and her husband had been having financial difficulties and decided to try to get disability benefits for her children after learning that a friend had received such benefits for a child who was having breathing problems. During that conversation, defendant described several incidents—which were consistent with the testimony of other witnesses—in which she had attempted to induce such breathing problems in her children. Defendant also told Marshall that, on the day her daughter was taken to the hospital just prior to her death, she had attempted several times to put a pillow over her face in order to cause breathing problems in anticipation of the arrival of a home health nurse that day. Defendant stated that she "didn't mean for it to go as far as it did,"[5] but that the nurse who was scheduled to come to the house had arrived late.

In addition, a claims representative for the Supplemental Security Income (hereinafter SSI) program testified regarding defendant's applications for disability benefits on behalf of her children based upon alleged lung problems/obstructive apnea, which applications were ultimately successful. The People attempted to demonstrate a correlation between the timing of

---

General Hospital, who also had an opportunity to examine defendant's daughter prior to her pacemaker surgery and opined that her life threatening events were occurring because she being suffocated.

5. Defendant also admitted to a police investigator that she had attempted to smother her daughter once shortly after her birth. She was not charged with any crime occurring on that earlier date.

various aspects of the application process—including reviews of entitlement to benefits and payments made—and the occurrence or "remission" of the children's apnea events in order to prove that defendant induced their problems at particular times in her effort to obtain or maintain eligibility for such benefits.

Dapheny Wright, a salesperson for a mobile home company, testified that she first encountered defendant and her boyfriend in 1995 when they purchased a mobile home. Wright was concerned about their ability to secure financing for the purchase, as their income consisted of public assistance and SSI benefits. When Wright asked defendant whether the SSI benefits were permanent, defendant responded that the benefits were for her daughter, who was disabled due to "respiratory problems and weak blood," that she anticipated the condition to be a long-term disability and that the benefits would continue for the rest of the child's life. Wright further testified that defendant and her boyfriend presented themselves at her office on January 19, 1996—within days of the death of defendant's daughter—and informed her that they had lost their daughter, who was their main source of income, and indicated that they were in danger of losing their home.

"In reviewing the legal sufficiency of a verdict, we must view the evidence in the light most favorable to the People, and determine whether there is any valid line of reasoning and permissible inferences which could lead a rational person to the conclusion reached by the jury . . . and as a matter of law satisfy the proof and burden requirements for every element of the crime[s] charged" (*People v Somerville*, 72 AD3d 1285, 1286 [2010] [internal quotation marks and citations omitted]; *see People v Snow*, 79 AD3d 1252, 1255 [2010], *lv denied* 16 NY3d 800 [2011]). We readily conclude that the record contains legally sufficient evidence that defendant repeatedly suffocated her children knowing that she was subjecting them to a grave risk of death and caused them serious physical injury, and that, in doing so, she recklessly caused the death of her daughter. The element of mens rea—an element of all the charges upon which defendant was convicted—requires further discussion, as the law has evolved substantially since the date of her conviction.[6] At the time of defendant's conviction, the Court of Appeals had established an objective view of depraved indifference relative

---

6. Incredibly, and regrettably, although the notice of appeal from the judgment of conviction was timely filed in 2001 and the notice of appeal from the order denying defendant's CPL 440.10 motion was also timely filed in 2005, this appeal was not perfected until 2011—10 years after defendant's conviction.

to the circumstances under which the crime was committed (*see generally People v Register*, 60 NY2d 270 [1983], *cert denied* 466 US 953 [1984]). Here, the jury was charged, and defendant was convicted, under that view of the law. In a series of more recent cases (*see generally People v Suarez*, 6 NY3d 202 [2005]; *People v Payne*, 3 NY3d 266 [2004]; *People v Gonzalez*, 1 NY3d 464 [2004]; *People v Hafeez*, 100 NY2d 253 [2003]), culminating in *People v Feingold* (7 NY3d 288 [2006]), the Court of Appeals clarified depraved indifference as a mens rea element. Defendant's direct appeal was pending when this change in the law occurred,[7] and so we must decide defendant's legal sufficiency claims in accord with the law as it now exists (*see People v Jean-Baptiste*, 11 NY3d 539, 541-542 [2008]; *People v Vasquez*, 88 NY2d 561, 573 [1996]; *People v George*, 43 AD3d 560, 562 [2007], *affd* 11 NY3d 848 [2008]).

Mens rea may be demonstrated by circumstantial evidence (*see People v Manos*, 73 AD3d 1333, 1334 [2010], *lv denied* 15 NY3d 807 [2010]). In the event of an unintentional killing of a single individual, depraved indifference may be established, as relevant here, where the " 'defendant—acting with a conscious objective not to kill but to harm—engages in torture or a brutal, prolonged and ultimately fatal course of conduct against a particularly vulnerable victim' " (*People v Taylor*, 15 NY3d 518, 523 [2010], quoting *People v Suarez*, 6 NY3d at 212; *see People v Smith*, 41 AD3d 964, 966 [2007], *lv denied* 9 NY3d 881 [2007]). The defendant's actions must "reflect wanton cruelty, brutality or callousness [and be] combined with utter indifference to the life or safety" of the victim (*People v Varmette*, 70 AD3d 1167, 1169 [2010], *lv denied* 14 NY3d 845 [2010] [internal quotation marks and citations omitted]; *see People v Ford*, 43 AD3d 571, 573 [2007], *lv denied* 9 NY3d 1033 [2008]). The Court of Appeals has stated that " 'depraved indifference is best understood as an utter disregard for the value of human life—a willingness to act not because one intends harm, but because one simply doesn't care whether grievous harm results or not' " (*People v Feingold*, 7 NY3d at 296, quoting *People v Suarez*, 6 NY3d at 214). As set forth above, the proof here revealed that defendant repeatedly suffocated her two helpless children and forced them to undergo unnecessary medical procedures, callously causing repeated injury to each of them without regard to the risk of grievous harm posed by her actions, which ultimately resulted in her daughter's death. Defendant's indifference to the lives

---

7. This Court has previously fixed *People v Payne* (3 NY3d 266 [2004]) as the point at which the new rule came into effect (*see People v Baptiste*, 51 AD3d 184, 192-195 [2008], *lv denied* 10 NY3d 932 [2008]).

and safety of her children was further demonstrated in the testimony describing her behavior on the day that she last suffocated her daughter; the person whom defendant later described as a "home health nurse" arrived at defendant's home to find that the child was not breathing, had no pulse, was limp, colorless and "ice cold," and that defendant had not called for help. This individual, a parent monitor, testified at trial that although she repeatedly instructed defendant to perform rescue breathing, defendant did not do so. Instead, defendant "just [sat] there," tearless and doing nothing, while the monitor summoned rescue personnel and tended to the child. Defendant's state of apparent unconcern continued at the hospital; while medical personnel attempted to resuscitate her daughter, defendant remained outside the treatment room, calmly eating snacks.

The evidence revealed that defendant's sole reason for wishing that her children would not die as a result of her repeated, brutal acts was so that she might continue to torture them, and thereby continue to receive disability benefits. This wish—to be able to indefinitely continue brutalizing her children for financial gain—does not and cannot constitute anything but the most " 'utter disregard for the value of human life' " (*People v Feingold*, 7 NY3d at 296, quoting *People v Suarez*, 6 NY3d at 214) and for her children's lives. Indeed, defendant's wish to continue to profit from her children's pain and suffering was cruelly depraved. Her desire for her children to continue living only to serve her cruel purpose cannot legally be deemed to constitute even the smallest shred of concern for their lives or safety. Thus, we find that the evidence of depraved indifference is legally sufficient to support defendant's convictions (*see People v McLain*, 80 AD3d 992, 996 [2011], *lv denied* 16 NY3d 897 [2011]; *People v Manos*, 73 AD3d at 1334-1338; *People v Varmette*, 70 AD3d at 1169-1171; *People v Ford*, 43 AD3d at 572-574).

As to defendant's challenge to the weight of the evidence, where a different verdict would not have been unreasonable, we view the evidence in a neutral light and, according deference to the jury's credibility determinations, "weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony" (*People v Bleakley*, 69 NY2d 490, 495 [1987] [internal quotation marks and citation omitted]). Having weighed the evidence, as we must, "in light of the elements as charged to the jury without objection by defendant" (*People v Carter*, 40 AD3d 1310, 1311 [2007], *lv denied* 9 NY3d 873 [2007]; *see People v Johnson*, 10

NY3d 875, 878 [2008]), "even when the law has changed between the time of trial and the time of appeal" (*People v Danielson*, 9 NY3d 342, 349 [2007]), we reject defendant's contention that her convictions are against the weight of the credible evidence (*see People v Register*, 60 NY2d at 274-280; *People v Strawbridge*, 299 AD2d 584, 593-594 [2002], *lv denied* 99 NY2d 632 [2003]; *People v Dexheimer*, 214 AD2d 898, 901 [1995], *lv denied* 86 NY2d 872 [1995]).

Next, we turn to consider defendant's further procedural and evidentiary challenges. Defendant's contention that she was denied a fair trial because the Franklin County District Attorney's office improperly delegated its prosecutorial authority by allowing several attorneys not employed by the District Attorney to participate in the proceedings is unpreserved for our review, as defendant failed to register any objections to the prosecution team at trial. We also reject defendant's assertion that the claimed error—the appearance at trial of the District Attorney of another county and an Assistant Attorney General—falls within one of the narrow exceptions to the preservation requirement as a matter that affects "the organization of the court or the mode of proceedings proscribed by law" (*People v Patterson*, 39 NY2d 288, 295 [1976], *affd* 432 US 197 [1977]; *see People v Agramonte*, 87 NY2d 765, 769-770 [1996]; *People v Thomas*, 50 NY2d 467, 471 [1980]; *People v Beaudoin*, 198 AD2d 610, 611 [1993], *lv denied* 82 NY2d 922 [1994]). Defendant's argument that she was denied a fair trial because certain of the People's witnesses were allowed access to grand jury minutes and exhibits is also unpreserved. Moreover, to the extent that there was any error, such error was harmless in light of the overwhelming evidence of defendant's guilt (*see People v Brockway*, 255 AD2d 988, 988-989 [1998], *lv denied* 93 NY2d 967 [1999]).

As to defendant's evidentiary objections, we note first that she failed to preserve her argument that her constitutional right to confrontation was violated by the admission into evidence of certain medical records and expert testimony that relied on hearsay, as she did not raise this constitutional objection at trial (*see People v Kello*, 96 NY2d 740, 743-744 [2001]). Such argument is, in any event, without merit. To the extent that defendant objected to the admission of such evidence on the ground of relevance or impermissible hearsay, County Court properly overruled such objections as the evidence was either "based on facts in the record or personally known to the witness" or fell within a well-recognized exception to the hearsay rule (*Hambsch v New York City Tr. Auth.*, 63 NY2d 723, 725-726

[1984]; *see* CPLR 4518; CPL 60.10; *People v Wright*, 81 AD3d 1161, 1164 [2011], *lv denied* 17 NY3d 803 [2011]; *People v Bruno*, 47 AD3d 1064, 1066 [2008], *lv denied* 10 NY3d 809 [2008]). Any remaining evidentiary errors were harmless (*see People v Crimmins*, 36 NY2d 230, 241-243 [1975]).

Defendant's CPL 440.10 motion to vacate the judgment of conviction on the ground of ineffective assistance of counsel was properly denied without a hearing. A postjudgment motion brought pursuant to this statute will not necessitate a hearing in every instance, and it is the trial court's prerogative to make the preliminary determination of whether such a hearing is necessary (*see* CPL 440.30 [1], [4] [a]; *People v Satterfield*, 66 NY2d 796, 799 [1985]). Here, the written submissions on defendant's motion and the massive trial record were sufficient to determine whether counsel's performance was effective (*see People v Clarke*, 5 AD3d 807, 810 [2004], *lv denied* 2 NY3d 797 [2004]; *People v Murray*, 300 AD2d 819, 821 [2002], *lv denied* 99 NY2d 617 [2003]), particularly in view of the fact that the judge who denied the motion presided at trial and witnessed defense counsel's performance firsthand (*see People v Morehouse*, 5 AD3d 925, 926 [2004], *lv denied* 3 NY3d 644 [2004]; *People v Turcotte*, 252 AD2d 818, 820 [1998], *lv denied* 92 NY2d 1054 [1999]).

Although defendant now points to numerous claimed trial errors, including counsel's decisions not to call certain medical experts to testify and not to present any medical expert testimony in her defense, defendant failed to meet her burden to " 'demonstrate the absence of strategic or other legitimate explanations' " for counsel's alleged deficiencies at trial (*People v Baker*, 14 NY3d 266, 270-271 [2010], quoting *People v Rivera*, 71 NY2d 705, 709 [1988]; *accord People v Henry*, 81 AD3d 1165, 1165 [2011]). Counsel's affidavit amply demonstrates that he considered presenting the testimony of a myriad of experts and made reasonable strategic decisions not to do so on the basis that he felt it would be damaging to defendant's case. Viewed objectively and without the benefit of hindsight, the record "reveal[s] the existence of a trial strategy that might well have been pursued by a reasonably competent attorney" (*People v Satterfield*, 66 NY2d at 799; *see People v Caban*, 5 NY3d 143, 152 [2005]; *People v Benevento*, 91 NY2d 708, 714-715 [1998]; *People v Rivera*, 71 NY2d at 709; *People v Miller*, 13 AD3d 890, 892 [2004]).

Moreover, defense counsel engaged in pointed and thorough cross-examination of the People's witnesses, showed a complete understanding of and the ability to navigate both medical and

technical information, raised proper objections and offered articulate opening and closing arguments, among other things. In addition, defense counsel succeeded in having County Court charge the jury with lesser included offenses of some of the crimes charged in the indictment and in securing an acquittal on several of the initial charges.[8] Even if counsel's representation was less than perfect, " 'the evidence, the law, and the circumstances of [the] case, viewed in totality and as of the time of the representation, reveal that the attorney provided meaningful representation' " (*People v Henry*, 95 NY2d 563, 565 [2000], quoting *People v Baldi*, 54 NY2d 137, 147 [1981]; *see People v Benevento*, 91 NY2d at 714-715; *People v Battease*, 74 AD3d 1571, 1575-1576 [2010], *lv denied* 15 NY3d 849 [2010]).

Defendant's contention that her sentence is harsh or excessive is unavailing. Even if defendant had preserved her claim that she was punished for asserting her right to trial by the imposition of a longer sentence than that offered during plea negotiations (*see People v Ward*, 10 AD3d 805, 808 [2004], *lv denied* 4 NY3d 768 [2005]), the record contains no evidence of retaliation (*see People v Molina*, 73 AD3d 1292, 1293 [2010], *lv denied* 15 NY3d 807 [2010]; *compare People v Nelson*, 68 AD3d 1252, 1256 [2009]). Contrary to defendant's contention, the sentencing minutes reveal that County Court clearly specified that all of the sentences—including that for murder in the second degree—were to run consecutively, with the exception of one reckless endangerment conviction. Consecutive sentences were properly imposed as "the acts involved, though part of a continuous course of conduct, can be separated into separate and distinct events" (*People v Williams*, 51 AD3d 1141, 1145 [2008], *lvs denied* 10 NY3d 959, 965 [2008] [internal quotation marks and citations omitted]; *see People v Salcedo*, 92 NY2d 1019, 1021 [1998]). We find no abuse of discretion or extraordinary circumstances warranting modification in view of the youth and vulnerability of her victims and the callous nature of her violent crimes (*see People v Smith*, 41 AD3d at 967).

Peters, J.P., and Spain, J., concur.

Stein, J. (concurring). We agree with the majority's determination that defendant's convictions should be affirmed. However, we write separately to express our opinion that the legal sufficiency of the evidence supporting her convictions should be reviewed in light of the law as it existed at the time of

---

**8.** Some of defendant's convictions were, in fact, for such lesser included offenses. Defendant was also acquitted of attempted murder in the second degree and five of the counts of assault in the first degree set forth in the indictment.

trial. In our view, defendant's motion for a trial order of dismissal relating to legal sufficiency "was based on the perceived inadequacy of the proof, not on an interpretation of an element of the offense" (*People v Ford*, 11 NY3d 875, 879 [2008]). Because there was no objection to the jury charge with respect to depraved indifference, "the legal sufficiency of defendant's conviction must be viewed in light of the court's charge as given without exception" (*id.* at 878; *compare People v Jean-Baptiste*, 11 NY3d 539, 544 [2008]). Under these circumstances, and based on our review of the record in that light, we would uphold the verdict against defendant.

Even if we were to agree with the majority's determination that the evidence should be reviewed in accordance with the law as it now exists pursuant to *People v Feingold* (7 NY3d 288 [2006]), and find a valid line of reasoning and permissible inferences that could lead a rational person to the conclusion reached by the jury on the basis of the evidence adduced at trial under such analysis, we are of the view that defendant would be entitled to a new trial (*see People v Hill*, 85 NY2d 256, 264 [1995]). While the jury was properly charged with the definition of depraved indifference as it was understood at the time of defendant's trial, as a result of the unfortunate, lengthy delay in perfecting the instant appeal and a clear change in the law since her conviction, County Court's instruction to the jury did not comport with the now current law in that it did not include the mens rea element. Although we may opine that the evidence *would be* legally sufficient to convict defendant under *People v Feingold* (*supra*), we cannot determine whether the jury would have found her guilty under the current state of the law (*see generally People v Hill*, 85 NY2d at 264), and we may not supplant the role of the jury in making such finding in the first instance. To conclude otherwise effectively convicts defendant in contravention of her fundamental right to be tried by a jury.

McCarthy, J., concurs. Ordered that the judgment and order are affirmed.